**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| IN THE MATTER OF:<br>ANTHONY WAYNE SPEARS<br><br>Debtor. | Case No. BK 11-81207<br><br>CHAPTER 7 |
| ANTHONY W. SPEARS & TROY O. ROBINSON,<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSITY ACCOUNTING SERVICES, LLC; YOUNOMICS PRIVATE STUDENT LOAN TRUST; NAVIENT SOLUTIONS, LLC; AND NELNET SERVICING, LLC, D/B/A FIRSTMARK SERVICES,<br><br>Defendants. | **Adv. Proc. No. 8:19-ap-8033** |

**REPLY IN SUPPORT OF DEFENDANT NATIONAL COLLEGIATE TRUST 2006-A'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant National Collegiate Trust 2006-A (the "Trust") submits this Reply in Support of its Motion to Dismiss (ECF No. 162) (the "Motion") Debtor and Plaintiff Anthony W. Spears ("Spears") and Plaintiff Troy O. Robinson's ("Robinson" and, together with Spears, "Plaintiffs") Second Amended Complaint (ECF No. 136) (the "SAC") for failure to state a claim upon which relief can be granted, and respectfully states as follows:

1

# I. ARGUMENT

## A. The Court Has Not Yet Considered, Much Less "Rejected," the Trust's Arguments Concerning § 523(a)(8)(B).

Plaintiffs first assert that "this Court has already considered—and rejected—the very same arguments" concerning § 523(a)(8)(B) raised in the Trust's Motion. (ECF No. 168, p. 10.) In particular, Plaintiffs contend that the Trust's arguments should be foreclosed by the Court's partial denial of Defendant Nelnet Servicing, LLC, d/b/a Firstmark Services' ("Firstmark") previously-filed motion to dismiss. (*Id.*) Plaintiffs do not suggest that the Trust's arguments are barred by any recognized preclusion doctrine (*e.g.*, collateral estoppel). Instead, Plaintiffs posit that when the Court denied Firstmark's motion to dismiss Plaintiffs' contempt claim, it "implicitly rejected the Trust's argument regarding [§] 523(a)(8)(B)." (*Id.*)

Plaintiffs' argument distorts both the nature of Firstmark's motion and the Court's ruling on it. Firstmark acknowledged that it lacked standing or authority to litigate the threshold issue of dischargeability, and explicitly stated that it did not seek a determination as to whether § 523(a)(8)(B) rendered Plaintiffs' loans nondischargeable. (*See* ECF No. 108, p. 21 n.18.) Rather, Firstmark narrowly moved for dismissal on two grounds: first, that the Trust was the necessary defendant to litigate the threshold issue of dischargeability; and second, that Plaintiffs' follow-on claim for contempt failed because Firstmark's alleged conduct was objectively reasonable, and hence not contemptible. (*See* ECF No. 108.) The Court agreed with Firstmark's first theory and required Plaintiffs to join the Trust as a necessary defendant to Plaintiffs' dischargeability claim. (ECF No. 130.) The Court deferred ruling on Firstmark's second theory on the grounds that whether Firstmark's alleged conduct was objectively reasonable constituted a question of fact, rather than law. (*See* ECF No. 131, at 11:20 – 11:30.) The Court did not even address the threshold issue dischargeability. On the contrary, the Court explained that "if we get

2

the [Trust] in, I'm not inclined to dismiss the adversary proceeding, we'll have the [Trust] here, it can deal with the declaratory judgment part of it." (*Id.*, at 12:10 – 12:20.) The Trust is now here, and Plaintiffs' declaratory judgment claim is, for the first time, ripe for adjudication. To that end, the Trust submits that the issue of nondischargeability under § 523(a)(8)(B) can be decided on purely legal grounds in accordance with FED. R. CIV. P. 12.

### B. Plaintiffs Mischaracterize the Holdings in *Noland* and *Carow*.

Plaintiffs do not dispute the fact that numerous courts—including this one—have declared private student loan debt nondischargeable under § 523(a)(8)(B) by looking to the purpose of the loan as reflected in the underlying loan documents. Nor do Plaintiffs challenge the persuasiveness of these courts' decisions. Instead, Plaintiffs engage in a strained effort to distinguish the facts and procedural postures of this case from those in *Noland v. v. Iowa Student Loan Liquidity Corp.*[1]. and *Carow v. Chase Student Loan Service.*[2] However, Plaintiffs' attempts to differentiate this case from *Noland* and *Carow* are misleading and unconvincing.

First, Plaintiffs argue that *Noland* "did not determine that the loans were qualified education loans," and instead merely denied the debtor's affirmative motion for summary judgment on the issue of whether the loans were *not* qualified education loans. (ECF No. 168, p. 15.) In other words, Plaintiffs interpret *Noland* as leaving open the ultimate question of whether the debtor's loans were nondischargeable qualified education loans within the meaning of 11 U.S.C. § 523(a)(8)(B).

Plaintiffs' reading of *Noland* is not supportable. In substance, the opinion in *Noland* unequivocally lays out the salient factors (*i.e.*, what purpose the parties intended the loan to serve and what expenses the parties agreed the loan proceeds could be applied against) and the

---

[1] Nos. BK09-80873-TJM, A09-8048-TJM, 2010 Bankr. LEXIS 1188 (Bankr. D. Neb. Mar. 30, 2010).
[2] Adv. No. 10-7011, 2011 WL 802847, 2011 WL 802847, 2011 Bankr. LEXIS 823 (Bankr. D.N.D. Mar. 2, 2011).

3

unimportant factors (*i.e.*, how the borrower actually spent the loan proceeds, where the loan fell in the borrower's overall debt stack, and whether the borrower's student loan debt exceeded the "cost of attendance") to be considered when applying § 523(a)(8)(B). Further, shortly after it issued its opinion in *Noland*, the Court entered a separate order acknowledging that it had "inadvertently overlooked" and "neglected to rule on" the creditor's cross-motion for summary judgment.[3] In that subsequent order, the Court "adopted in full" the analysis set forth in its earlier opinion and promptly granted the creditor's cross-motion for summary judgment, thereby declaring the loans nondischargeable. (*Id.*) Contrary to Plaintiffs' suggestion, the Court in *Noland* was not waiting for additional evidence of the debtor's "cost of attendance" to decide the issue of dischargeability; the Court deemed those facts unnecessary. Thus, *Noland* stands for the simple proposition, as recognized by numerous other courts, that a student loan made to a borrower attending a Title IV-eligible school constitutes a nondischargeable "qualified education loan" under 523(a)(8)(B) where the loan documents contain certifications by the borrower that he will use the loan proceeds exclusively for educational expenses.

Second, Plaintiffs attempt to minimize *Carow* by arguing that the court "noted the lack of evidence as to the 'cost of attendance' as a reason for its decision." (ECF No. 168, p. 16.) Plaintiffs seem to imply that the outcome in *Carow* might have been somehow different had the parties presented better evidence of the debtor's "cost of attendance." Plaintiffs provide no basis for that assumption, which misconstrues the significance—or, more accurately, the insignificance—of the debtor's precise "cost of attendance" to the holding in *Carow*. The court in *Carow* determined that the debtor's loans were nondischargeable "qualified education loans" *without* any evidence of

---

[3] *See* Written Opinion/Order Re: Cross-Motion for Summary Judgment Filed by Defendant Iowa Student Loan Liquidity Corp., *Noland v. Iowa Student Loan Liquidity Corp.*, Adv. Proc. No. A09-8048-TJM [https://ecf.neb.uscourts.gov/doc1/11214796553].

4

the precise "cost of attendance." *See Carow*, 2011 WL 802847, 2011 Bankr. LEXIS 823, at *9. Instead, the holding *Carow* was premised on the following:

> Debtor certified on each promissory note that she would use the proceeds for qualified higher education expenses or for costs associated with her attendance at school. She stipulated and testified that she obtained and used the Chase loans to pay educational and living expenses. In other words, she used the Chase loans to fund her 'cost of attendance.' As such, the Chase loans were used for 'qualified higher education expenses' and are 'qualified education loans' as contemplated by section 523(a)(8)(B).

*Id. Carow* thus reiterated that private student loans should be declared nondischargeable "qualified education loans" under § 523(a)(8)(B), without any need to ascertain the borrower's precise "cost of attendance," provided that the borrower attended a Title IV-eligible school and certified that she would use the loan solely for educational expenses.

Finally, Plaintiffs argue that these cases are distinguishable because they involved debtors whose "argument[s] hinged solely on the assertion that the loan[s were] not used for educational expenses." (ECF No. 168, p. 12.) Plaintiffs insist that they are unique because their "argument is that the Loans held by the Trust exceeded the cost of attendance or the qualified higher education expenses." (*Id.*) Again, Plaintiffs are simply wrong. The debtor in *Carow* specifically stipulated that she used her private student loan proceeds to "pay educational expenses." *See Carow*, 2011 Bankr. LEXIS 823, at *3. She also presented evidence that her loans exceeded her "cost of attendance" in the form of testimony from her schools' financial aid administrators that "loans can only be certified up to the cost of attendance" and that her private student loans "could not have been certified because they were above and beyond [her] eligibility." *Carow*, 2011 WL 802847, 2011 Bankr. LEXIS 823, at *4 – 5. Plaintiffs are not making new arguments; they are retreading already-discredited ones.

5

Moreover, and setting aside Plaintiffs' inaccurate portrayal of the case law, the distinction Plaintiffs attempt to draw is one without a difference. At bottom, Plaintiffs seek to supplant the "purpose of the loan" test with a used-based test. Although Plaintiffs couch their theory in technical statutory terms, their basic idea is simple: Plaintiffs claim they could not have possibly *used* their loan proceeds solely to defray their educational expenses because they borrowed more than they needed to defray those expenses. No amount of careful wordsmithing can change the fact that Plaintiffs seek to superimpose a use-based test over the widely accepted and soundly reasoned "purpose of the loan" test. The Court should not indulge Plaintiffs' invitation to depart from the substantial body of law applying the "purpose of the loan" test.

**C. Plaintiffs' Attempt to Erase Their Self-Certifications and Escape Their Contractual Promises Relies on Inapposite Case Law Dealing with Blanket Pre-Petition Waivers of Bankruptcy Protection.**

Plaintiffs also argue that their self-certifications (*i.e.*, the written certifications in their promissory notes whereby they promised to use the Loans' proceeds exclusively for Robinson's "tuition and educational expenses") are "irrelevant" and should be disregarded on public policy grounds. To support their argument, Plaintiffs cite several cases which refused to enforce prepetition waivers of bankruptcy protection.

Plaintiffs' straw-man argument conflates, on one hand, blanket prepetition waivers of bankruptcy protection with, on the other hand, substantive representations of fact. While general waivers of bankruptcy protection are void as against policy, creditors are free to enforce debtor's prepetition representations and stipulations about "underlying facts that would aid in determining nondischargeability." *Eveland v. Jordan*, No. 13-00772, 13-09093, 2015 Bankr. LEXIS 643, at *9 (Bankr. N.D. Iowa Mar. 2, 2015) ("[W]hen the debtor admits to the facts that would establish fraud, he or she is, in essence, stipulating to the facts required to determine nondischargeability."); *see also Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987) ("For public policy

reasons, a debtor may not contract away the right to a discharge in bankruptcy. However, a debtor may stipulate to the underlying facts that the bankruptcy court must examine to determine whether a debt is dischargeable."). For example, a debtor who enters into a prepetition agreement defining a debt "as necessary for [domestic] support" has, "by that definition," rendered the debt nondischargeable under § 523(a)(5); in such circumstances, the "waiver doctrine is not applicable." *See Edwards v. Edwards*, 172 B.R. 505, 524 (Bankr. D. Conn. 1994).

Not surprisingly, the cases cited by Plaintiffs are inapposite because they involve conspicuous prepetition waivers of bankruptcy protection. *See, e.g.*, *In re Pease*, 195 B.R. 431 (Bankr. D. Neb. 1996) (refusing to enforce prepetition agreement which "prohibit[ed] debtors from filing a voluntary petition under the Bankruptcy Code" and, in the event debtors filed for bankruptcy, "prohibit[ed] debtors from resisting both a motion to lift the automatic stay of 11 U.S.C. § 362 and a motion to dismiss the bankruptcy case"); *Bank of China v. Huang*, 275 F.3d 1173, 1176 (9th Cir. 2002) (refusing to enforce prepetition agreement waiving right to file for bankruptcy, seek discharge of debt, or invoke protection of automatic stay, and requiring debtor to reject and disavow case law holding such waivers to be unenforceable); *see also Fallick v. Kehr*, 369 F.2d 899 (2d Cir. 1966) (holding that a prepetition arbitration agreement did not constitute "an advance agreement to waive the benefits" of bankruptcy). Here, Plaintiffs' self-certifications do not mention the issue of dischargeability or even allude to bankruptcy at all. It is obvious that Plaintiffs' self-certifications do not constitute the kind of bare waivers at issue in the above-cited cases.

Rather, Plaintiffs' self-certifications define the purpose of their Loans and establish a specific fact—that Plaintiffs would use the proceeds of their Loans solely to pay Robinson's "tuition and other educational expenses" at Butler and Logan, respectively. (ECF No. 107-1, p. 2;

7

ECF No. 107-2, p. 2.) It is that agreed upon fact, combined with the Title IV-eligibility of Robinson's schools and the "purpose of the loan" doctrine, which compels the conclusion that Plaintiffs' Loans are nondischargeable "qualified education loans" under § 523(a)(8)(B). *See Edwards*, 172 B.R. at 524 (holding that parties' prepetition agreement defining purpose of debt as "necessary for support" brought it within the exception to discharge under § 523(a)(5)). Plaintiffs' attempt to recast their self-certifications as legally impermissible waivers represents just another veiled attack on the "purpose of the loan" doctrine.

### D. Plaintiffs' Argument that the "Purpose of the Loan" Test Should Only Apply to Loans that "Fall within the Framework" § 523(a)(8)(B) Is Tautological.

Next, Plaintiffs theorize the "purpose of the loan" doctrine is "inapplicable" and "irrelevant" when the "underlying loan on its face does not fall within any of the subsections of § 523(a)(8)." (ECF No. 168, p. 15.) This hypothesis only begs the question: How should courts actually decide whether a loan, "on its face," meets the criteria to be considered a "qualified education loan" under § 523(a)(8)(B)? The answer, as the Trust's authorities confirm, is that courts apply the "purpose of the loan" test in order to determine whether a loan falls under § 523(a)(8)(B). That test, as applied to here, drives the conclusion that Plaintiffs' Loans are nondischargeable "qualified education loans."

Plaintiffs, of course, wish to replace that test with a different, far more complicated one. Specifically, they urge that the Trust's "only recourse is to affirmatively demonstrate through the course of these proceedings that, for each Loan, after considering all certified loans, financial assistance and scholarships, and any loans made prior to the Trust's Loans, the Trust's Loans do not exceed the qualified higher education expenses." (ECF No. 168, p. 12.) Similarly, Plaintiffs assert—without citation or support—that "the 'cost of attendance' must be reduced by all certified loans, financial assistance and scholarships, and any loans made prior to the Trust's Loans to

8

determine the 'qualified higher education expenses.'" (*Id.*, p. 15.) That formulation has no basis in law. In fact, just recently, Plaintiffs' counsel unsuccessfully tried to convince a different bankruptcy court to adopt this proposed test. The court was not persuaded, explaining:

> Plaintiff next claims in his supplemental memorandum that Plaintiff's federal student loans already covered a significant amount of the cost of attending Linda Loma University, meaning that Charter One was disbursing amounts in excess of Linda Loma's cost of attendance. This implies that Charter One had both knowledge of Plaintiff's other Loans and the obligation to adjust the amounts disbursed accordingly. Plaintiff, however, has provided no persuasive authority to support such a legal or factual conclusion, and thus the argument fails.

*Mata v. Nat'l Collegiate Student Loan Tr. 2006-1*, Nos. 6:13-bk-30625, 6:18-ap-01089-MH, 2020 Bankr. LEXIS 2085, at *11 (Bankr. C.D. Cal. July 31, 2020).

Furthermore, Plaintiffs' artificial test does not incorporate the statutory scheme and defined terms under 11 U.S.C. § 523(a)(8)(B) and 26 U.S.C. § 221(d)—it perverts them. The Internal Revenue Code defines "qualified higher education expenses" to mean the "cost of attendance," as defined by 20 U.S.C. § 1087ll, "reduced by the sum" of five discrete categories of non-taxable income. *See* 26 U.S.C. § 221(d)(2). Those five discrete categories of non-taxable income include: amounts attributable to an employer-sponsored "educational assistance program";[4] proceeds from the redemption of United States savings bonds;[5] earnings and distributions from state-operated college savings investment plans (*i.e.*, "529 plans");[6] distributions from federally-operated Coverdell education savings trusts;[7] and amounts attributable to a "scholarship, allowance, or payment" described in § 25A(g)(2) of the Internal Revenue Code.[8] In turn, § 25A(g)(2) of the Internal Revenue Code describes certain non-taxable "qualified scholarships,"[9] "educational

---

[4] *See* 26 U.S.C. §§ 221(d)(2)(A) and 127.
[5] *See* 26 U.S.C. §§ 221(d)(2)(A) and 135.
[6] *See* 26 U.S.C. §§ 221(d)(2)(A) and 529.
[7] *See* 26 U.S.C. §§ 221(d)(2)(A) and 530.
[8] *See* 26 U.S.C. §§ 221(d)(2)(B) and 25A(g)(2).
[9] *See* 26 U.S.C. §§ 25A(g)(2)(A) and 117.

assistance allowances" for military veterans and reserves,[10] and any other "payment…for such individual's educational expenses…which is excludable from gross income."[11] Notably, I.R.S. regulations clarify that the last category under § 25A(g)(2)—*i.e.*, a "payment…for such individual's educational expenses…which is excludable from gross income"—does *not* include student loans. *See* 26 C.F.R. § 1.25A-5(c)(4), (e)(2).[12]

Stated differently, Plaintiffs' test would subtract from a student borrower's "cost of attendance" virtually all forms of financial aid, including "all certified loans, financial assistance and scholarships, and any loans made prior to the Trust's Loans." (ECF No. 168, p. 15.) This made-up, self-serving accounting trick directly contravenes of the definition of "qualified higher education expenses" provided by § 221(d)(2), which only permits "qualified higher education expenses" to be offset by five discrete categories of non-taxable income, none of which includes loans. Plaintiffs' proposal would honor neither the established "purpose of the loan" test nor the statutory scheme which undergirds § 523(a)(8)(B). The Court should reject it.

**E. Plaintiffs' Attempts to Conjure a "Genuine Dispute of Material Fact" About Robinson's Precise "Cost of Attendance" Are Irrelevant to the Trust's Motion, and Do Not Preclude Dismissal under Fed. R. Civ. P. 12.**

Finally, Plaintiffs argue that archived financial aid information published by Butler and Logan are "not appropriate for consideration at the motion to dismiss stage" and are subject to "genuine disputes of material fact." (ECF No. 168, p. 17.) As a preliminary matter, the archived webpages cited in the Trust's principal brief, which were originally published by two accredited Title IV universities and which are currently maintained by archive.org, are subject to judicial notice and may therefore be considered with the Trust's Motion. *See Pohl v. MH Sub I, LLC*, 332

---

[10] *See* 26 U.S.C. § 25A(g)(2)(B); *see also* 38 U.S.C. chapters 30 – 35; 10 U.S.C. chapter 1606.
[11] *See* 26 U.S.C. § 25A(g)(2)(C).
[12] *See* 26 C.F.R. § 1.25A-5(c)(4), (e)(3).

10

F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases); *Nadler v. Village*, 545 B.R. 597, 599 n.1 (Bankr. W.D. Mo. 2016). And despite asking the Court to ignore these archived webpages, Plaintiffs do not question their accuracy. *See* FED. R. EVID. 201(b). Nor could Plaintiffs credibly do so; they allege in the SAC that "Cost of Attendance is determined by the eligible Title IV institution" and "published…on the Title IV institution's website." (ECF No. 136, ¶ 19.)

Furthermore, whatever discrepancies may exist between the figures reflected on Butler's and Logan's respective webpages and the figures Plaintiffs claim can be deduced from the Integrated Postsecondary Education Data System ("IPEDS"), they are immaterial.[13] It is evident from each source that the "cost of attendance" numbers alleged "upon information and belief" in Plaintiffs' SAC are inaccurate and misleadingly low. This is true irrespective of whether Robinson studied pharmacology or biology during the 2000 – 2001 academic year, or whether Robinson was in his third or fourth undergraduate year when he borrowed the 2001 Loan.

For example, the SAC alleges that Robinson's total "cost of attendance" at Butler during the 2000 – 2001 academic year was $18,671. (ECF No. 136, ¶ 27.) But IPEDS—which Plaintiffs apparently believe to be an authoritative source of data—reports a figure that even exceeds the amounts reflected in the archived webpage. Specifically, IPEDS indicates that Butler allocated the following amounts for undergraduate students during the 2000 – 2001 academic year:

- $18,040 for tuition and required fees;
- $700 for books and supplies;

---

[13] Because these discrepancies are immaterial, the existence of "genuine dispute of fact" is irrelevant. *See In re RFC & ResCap Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1127 (D. Minn. 2018). Further, the "genuine dispute of fact" standard governs motions for summary judgment, not motions to dismiss. *Compare* FED. R. CIV. P. 56(a) *with* Fed. R. CIV. P. 12(b)(6). For purposes of deciding the Trust's motion, the Court must accept all plausibly alleged facts as true. *See Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020). However, the Trust submits that Plaintiffs' conclusory assertions about "cost of attendance" are contradicted by publicly available records, lack basic plausibility and, hence, are not entitled to such a presumption. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 – 79 (2009).

11

- $6,300 for off-campus room and board;[14] and

- $1,750 for unspecified "other expenses."[15]

Together, these amounts total $26,790, which far exceeds the $18,671 figure alleged in the SAC. Moreover, the IPEDS data only considers a subset of the "cost of attendance" for "first-time" undergraduate students. (*Id.*) It does not factor additional charges for students enrolled in programs subject to differential tuition rates (like students enrolled in Butler's College of Pharmacy and Health Sciences), students enrolled in courses that require special lab or equipment fees, students taking heavier-than-normal course loads, or special charges assessed to upperclassmen like Robinson. Nor does it include any allowances whatsoever for several categories of expenses encompassed by the statutory definition of "cost of attendance."[16] In other words, the $26,790 figure from IPEDS represents the bare *minimum* "cost of attendance" for Butler undergraduates during the 2000 – 2001 year. This conclusively demonstrates that the 2001 Loan was well below Robinson's "cost of attendance." It also demonstrates that Plaintiffs' conclusory assertions about Robinson's "cost of attendance" during the 2000 – 2001 year lack basic plausibility and are not entitled to any presumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 – 79 (2009).

---

[14] Robinson's application for the 2001 Loan indicated that he lived off-campus. (ECF No. 107-1, p. 1.)

[15] *See* Integrated Postsecondary Education Data System, *Butler University Institutional Characteristics 2001 – 02*, NCES, *available at* https://nces.ed.gov/ipeds/datacenter/Facsimile.aspx?unitid=150163 (last accessed October 2, 2020). The IPEDS data only dates back to 2001 – 02; however, Butler's 2001 – 02 data also includes "cost of attendance" information for the 2000 – 2001 academic year. The IPEDS data is also subject to judicial notice because it is published by the federal government. *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 140 (E.D. Pa. 2012).

[16] *Compare* 20 U.S.C. § 1015a(a)(2), (i)(1)(N) (requiring schools to only report to IPEDS the "average annual cost of tuition and fees, room and board, books, supplies, and transportation…for a first-time, full-time undergraduate student"), *with* 20 U.S.C. § 1087ll (setting out thirteen separate components of "cost of attendance," and specifying that a student's "tuition and fees" budget must reflect the amount "assessed a student carrying the same academic workload…in the same course of study").

The 2005 – 2006 data for Logan is similarly unhelpful to Plaintiffs.  The SAC alleges—again, "upon information and belief—that Robinson's "cost of attendance" that year was $12,490.  (ECF No. 136, ¶ 31.)  But Plaintiffs' preferred source of data, IPEDS, reveals that this amount only reflects "typical tuition and required fees" for postgraduate chiropractic students.[17]  It says nothing about the twelve other components of "cost of attendance," which include, among other things, books, supplies, transportation, miscellaneous personal expenses, housing, food, and dependent care.  *See* 20 U.S.C. § 1087ll.

The figures obtained from Logan's archived webpage suggest these additional amounts more than doubled the overall "cost of attendance" to $26,470.[18]  Although the archived webpage states these figures are from the 2004 – 2005 academic year (*i.e.*, the year before Plaintiffs obtained the 2005 Loan), that statement appears to have been a typographical error.  It appears that the figures do, in fact, reflect allowances for the 2005 – 2006 academic year.  This is so for three reasons:  first, the webpage was archived in April of 2006, toward the end of the 2005 – 2006 academic year; second, the webpage lists tuition and fees at $12,490, which aligns with the tuition and fee estimates reported to IPEDS for the 2005 – 2006 year;[19] and third, a different archived version of Logan's website from March of 2005 (during the actual 2004 – 2005 academic year)

---

[17]  *See* Integrated Postsecondary Education Data System, *Logan University Institutional Characteristics 2005 – 06*, NCES, *available at* https://nces.ed.gov/ipeds/datacenter/Facsimile.aspx?unitid=177986 (last accessed October 2, 2020).  It is not surprising that Logan only reported "typical tuition and fees" to IPEDS, while omitting the various other components of "cost of attendance."  Federal law only requires schools to report allowances for room and board, books, supplies, and transportation for "first-time, full-time undergraduate" students—not postgraduate doctoral degree candidates like Robinson was during the 2005 – 2006 academic year.  *See* 20 U.S.C. § 1015a(a)(2), (i)(1)(N).
[18]  Logan College of Chiropractic, *Doctor of Chiropractic Cost of Attendance*, Logan.edu (April 8, 2006), *published at* http://www.logan.edu/pages/degreecost.asp, *archived at* https://web.archive.org/web/20060408215857/http://www.logan.edu:80/pages/degreecost.asp (last accessed October 2, 2020).
[19]  *See* note 17, *supra*.

13

reports a lower "cost of attendance" that contains an $11,970 tuition and fee component,[20] which aligns with the tuition and fee estimates reported to IPEDS for the 2004 – 2005 academic year.[21]

In any event, it is clear that Plaintiffs' reliance on mere tuition and fees is an improper substitute for the broad panoply of costs included within the "cost of attendance." Robinson's "cost of attendance" during the 2005 – 2006 academic year almost certainly dwarfed the size of the 2005 Loan. Plaintiffs' allegations otherwise once again lack the requisite plausibility to state a claim for relief, even if the Court goes beyond the "purpose of the loan" test and considers Robinson's precise "cost of attendance."

## II.     CONCLUSION

For the foregoing reasons, the Trust respectfully requests that the Court dismiss Plaintiffs' SAC as to the trust for failure to state a claim and enter such other and further relief as the Court deems just.

Dated: October 2, 2020

**PERRY, GUTHERY, HAASE
& GESSFORD, P.C., L.L.O.**

By:  */s/ Charles F. Kaplan*
Charles F. Kaplan, NE #25779
233 South 13th Street, Suite 1400
Lincoln, NE  68508
Telephone: (402) 476-9200
Facsimile: (402) 476-0094
Email: ckaplan@perrylawfirm.com
*Counsel for Defendant National Collegiate Trust 2006-A and Defendant Nelnet Servicing, LLC, d/b/a Firstmark Services*

---

[20] Logan College of Chiropractic, *Doctor of Chiropractic Cost of Attendance*, LOGAN.EDU (March 13, 2005), *published at* http://www.logan.edu:80/pages/degreecost.asp, *archived at* https://web.archive.org/web/20050313191405/http://www.logan.edu:80/pages/degreecost.asp (last accessed October 2, 2020).  This archived webpage is also subject to judicial notice for reasons discussed above.

[21] *See* note 17, *supra*.

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 2nd day of October, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notification to the following:

Lynn E. Swanson
Harvey S. Bartlett III
Lindsay Reeves
JONES, SWANSON, HUDDELL
 & GARRISON, L.L.C.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Email: lswanson@jonesswanson.com

Jason W. Burge
Kathryn J. Johnson
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Email: jburge@fishmanhaygood.com
      kjohnson@fishmanhaygood.com

Austin Smith
SMITH LAW GROUP
3 Mitchell Place
New York, New York 10017
(Tel.): 917.992.2121
Email: austin@acsmithlawgroup.com

*Attorney for Plaintiffs*

Jennine Hovell-Cox
LAW OFFICES OF JENNINE HOVELL-COX
P.O. Box 16276
Sugar Land, TX 77496-6276
Email: hovellcoxlaw@hotmail.com

Andrew R. Biehl
Matthew Kivett
Michael F. Kivett
WALENTINE O'TOOLE, L.L.P.
11240 Davenport Street
Omaha, NE 68154
Email: abiehl@walentineotoole.com
      matt@walentineotoole.com
      mfkivett@walentineotoole.com

*Attorneys for Navient Solutions LLC*

Whitney L. White
Charles R. Penot, Jr.
SESSIONS, FISHMAN, NATHAN
& ISRAEL, LLC
900 Jackson Street, Suite 440
Dallas, TX 75202-4473
Email: wwhite@sessions.legal
      cpenot@session.legal

*Attorneys University Accounting Service, LLC*

    I further certify that I have mailed by United States Postal Service the foregoing document to the following non-CM/ECF participants: None.

                                          */s/ Charles F. Kaplan*
                                          Charles F. Kaplan, NE #25779